**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | Case No. 21-20043-DDC |
| DALE HOWARD (01) and CARL E. ANDERSON (02), | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

Defendants Dale Howard and Carl Anderson have filed four motions to suppress. This order decides all four. Mr. Howard filed three separate motions (Docs. 46, 47, 48). They seek to suppress evidence collected from Mr. Howard's car (Doc. 46), his cell phone found near his car (Doc. 47), and Mr. Howard's residence inside his parents' home on N. 71st Street in Kansas City, Kansas (Doc. 48). Mr. Howard's co-defendant, Carl E. Anderson, filed his own Motion to Suppress (Doc. 49). It asks the court to suppress evidence collected from two cell phones that officers seized from his pocket during the search of the Howard residence. The government filed Responses opposing all four motions (Docs. 51, 52, 53, 67). Mr. Anderson filed a Reply (Doc. 63).[1]

The court held an evidentiary hearing on the motions on November 29, 2022. During this suppression hearing, Mr. Howard raised a new iteration of his challenge to officers' right to search his car. This new contention challenged the government's argument that a municipal

---

[1]    Also, Mr. Anderson filed a Motion to Join (Doc. 50) Mr. Howard's Motion to Suppress (Doc. 48) pertaining to the house search. The court granted Mr. Anderson's Motion to Join during the suppression hearing and thus treats Doc. 48 as a joint motion made by both defendants.

ordinance applied to the alley where the searched car was parked. The court gave Mr. Howard leave to file a supplemental brief on the status of the alley as a "highway" under the ordinance (Doc. 70). The government then responded to Mr. Howard's filing on the alley question (Doc. 72). And Mr. Howard filed an "Objection" (Doc. 73) to the government's response (Doc. 72).[2]

This Order denies the joint motion seeking to suppress evidence derived from searching the Howard residence (Doc. 48) and Mr. Howard's motion seeking to suppress the search of his cell phone (Doc. 47). But the court grants Mr. Howard's motion seeking to suppress the fruits of the search of his car (Doc. 46). The court also grants Mr. Anderson's Motion to Suppress the search of his phones (Doc. 49). The court explains its reasoning for these decisions, below.

## I.    Background and Controlling Facts

The court took evidence during the November 29 hearing, and unless otherwise noted, derives the following factual findings from evidence presented at that hearing.

### A.    Welfare Check

On July 6, 2021, officers from the Kansas City, Kansas, Police Department (KCKPD) responded to a welfare call from a residence on N. 71st Street, Kansas City, Kansas. The caller, David Howard, is defendant Dale Howard's father. Mr. David Howard told police that his wife had made suicidal statements. She was stressed, he reported, because her sons were fighting. David Howard also said that his son, Dale, had caused problems around the house because Dale was violent and selling methamphetamine. David Howard told officers that his son may have

---

[2]    Mr. Howard objects to the exhibits the government attached to its response because, Mr. Howard contends, the evidentiary record was closed and permitting the government to reopen the evidentiary record will prejudice Mr. Howard. To the extend the court must rule Mr. Howard's objection, it denies the objection. Even if the exhibits are improper new evidence submitted after the evidentiary record was closed, the additional submissions don't prejudice Mr. Howard because the court doesn't rely on them to decide the issues germane to the alley question in its analysis below.

some methamphetamine in his room, but he kept his room locked.  David Howard also

volunteered that his son had installed many security cameras around the Howard home.

### B.  Storage Facility Visit

A week later, on July 13, 2021, an unrelated investigation took KCKPD Detective Jakob

Blackman to an iStorage facility in Kansas City, Kansas.  While there, Detective Blackman

talked with an iStorage employee and learned that Dale Howard had rented a storage unit there.

Detective Blackman asked the employee if he could review iStorage's surveillance video.  The

iStorage employee agreed, and he displayed some of its surveillance footage.  One piece of

footage showed Mr. Howard entering an iStorage storage locker on July 13, 2021.  This video

also revealed that Mr. Howard drove a black BMW with Missouri license plate 6CEY27 during

his July 13 visit to the iStorage facility.[3]

### C.  BMW Search

The next day, July 14, 2021, KCKPD Officer Logan Smith was patrolling the area near

900 South Bethany Street in Kansas City, Kansas.  While driving a marked prisoner transport

van, Officer Smith noticed a black BMW parked in the alley.  A few days earlier, another officer

had reported that a BMW had fled from him, and Officer Smith suspected that he might have

found that BMW.  Officer Smith circled the block and watched the BMW parked in the alley.

Then, as Officer Smith pulled into the alley and approached the BMW, he saw a man and a

woman standing next to it.  Officer Smith began to get out of his police van and the man—a

white man in a black, cut off shirt—grabbed a bag from the BMW and ran away.  He passed

---

[3]      Detective Blackman, Officer Smith, and former Detective Seal—all members or former members
of KCKPD—testified at the suppression hearing.  Also, the parties submitted several exhibits that
included video and photos from police interaction with a black BMW and photos from the house search.

Officer Smith's van on its passenger side and continued past him down the alley.  Officer Smith

later identified the man who ran away from the BMW as Dale Howard.  Doc. 51 at 3.

A check of the license plate on the BMW—Missouri license plate 6CEY27—indicated

the tag was reported as stolen.  This was the same license plate shown on the black BMW driven

by Dale Howard and captured on iStorage's video, viewed the day before the alley incident by

Detective Blackman.  But a VIN search showed that the car itself was not reported stolen.  So,

Officer Smith tried to contact the car's registered owner, but to no avail.  Officer Smith then

requested a vehicle tow for the BMW under Unified Government of Wyandotte County Kansas

City (UG) Ordinance 35-196.

Officer Smith detained the woman who was standing next to the BMW with Mr. Howard

before he ran from the officer.  Her name was Ana Marcos.  The government asserted that

Officer Smith detained her because it appeared she was under the influence of narcotics.  Doc. 51

at 3.  Ms. Marcos told Officer Smith her shoulder bag contained a gun.  *Id.*  Officer Smith

searched the bag and found a loaded handgun, an ID, an electronic scale, and a bag of marijuana

residue.  *Id.*

Officer Smith then notified Detective Blackman and KCKPD Detective Nathan Doleshal

that he had located and detained Mr. Howard's BMW.  Both detectives came to the scene and

Detective Blackman confirmed that he had identified Mr. Howard the day before (on video)

driving a black BMW while entering iStorage.  The officers then conducted an inventory search

of the BMW.  During their inventory search, detectives located a Glock .45 caliber pistol and a

black bag in the BMW's trunk.  Inside the bag, detectives found a Sig Sauer 9-millimeter pistol,

multiple baggies, a bag of rubber bands, an electronic scale, and $32,998 in U.S. currency.

Based on his training and experience, Detective Blackman believed the items indicated a connection to drug trafficking.

### D.  Cell Phone Search

Following the encounter in the alley, law enforcement officers found Mr. Howard's abandoned cellphone on the ground in the middle of the alley, near Officer Smith's police van and along the same path where Mr. Howard had taken flight.  Officer Smith believed Mr. Howard had dropped the phone there.  Detective Blackman then applied for a warrant to search the contents of the phone on July 14, 2021.  The search warrant relied on the above facts— including the evidence found during the inventory search of the BMW—to establish probable cause for the phone.  Gov't Ex. 6.

### E.  Trash Collection and Home Search

Two days after the events in the alley, on July 16, 2021, KCKPD Narcotics Officers collected and searched the trash placed near the family home where Mr. Howard resided, *i.e.*, the house on N. 71st Street, Kansas City, Kansas.  In the trash, officers found four open, clear, large Zip-Lock plastic bags containing white residue.  Someone had labeled two of the bags with the letters "QP."  Detective Blackman's training led him to believe "QP" stood for a quarter pound of drugs.  Detective Blackman field tested the white residue in the bags and the tests produced a positive indication for methamphetamine.  Defendants don't challenge this trash pull or officers' search of its contents.

Three days later, on July 19, 2021, KCKPD Narcotics Detective Andy Seal requested and secured a search warrant for the Howard home on N. 71st Street.  Detective Seal's supporting affidavit recited the details of the investigation to that point.  Based on that investigation and his experience as a police officer, Detective Seal opined that he had "cause to believe that marijuana

(sic) [was located] at the premises of [the Howard residence on] N. 71st Street[.]"[4]  Gov't Ex. 8

at 4.  Detective Seal also asserted that he had "cause to believe that offenses against the laws of

the State of Kansas have been and are being violated, to wit, Possession and Distribution of

Methamphetamine." *Id.*  And so, Detective Seal requested a warrant authorizing "seizures of

methamphetamine, drug paraphernalia, United States currency, records of narcotics transactions,

weapons, documents, & electronic surveillance equipment[.]" *Id.*

 That same day, a Wyandotte County, Kansas District Court Judge issued a warrant

authorizing search of the residence on N. 71st Street.  Gov't Ex. 9 at 1.  The warrant authorized

law enforcement to search for and seize:

- Methamphetamine
- Drug Paraphernalia
- Weapons
- United States currency
- Surveillance equipment
- records of narcotics transactions, and documents which prove legal occupancy including, but not limited to, writings, books, checkbooks, and bank account statements, magazines, records, tax receipts, utility receipts, rent receipts, post-marked envelopes, photographs, and keys, all of which tend to show the identify of persons in ownership, dominion, or control of said premises.

*Id.*

 That same day, KCKPD officers served and executed the warrant at 6:45 a.m.  As

officers arrived, defendant Dale Howard fled from the house.  But officers caught him and took

him into custody.  The officers also apprehended another male, Carl Anderson—a co-defendant

here—who walked out of one of the residence's two upstairs bedrooms.  As the testimony

explained, this bedroom was not the same one occupied by Mr. Howard.  As they detained Mr.

Anderson, officers seized two cell phones from his right pants pocket.  Gov't Ex. 10 at 6.  During

---

[4] Despite the affidavit's reference to marijuana, the remainder of the affidavit refers to methamphetamine as the basis for probable cause.

their search of the home, officers found 21 firearms, ammunition, body armor, drug

paraphernalia, crystal methamphetamine, fentanyl, suspected marijuana, suspected cocaine,

suspected heroin, suspected hallucinogenic mushrooms, suspected Alparzolam, and $11,920 in

currency.  Doc. 1 at 7–9.  Officers found almost all of the evidence in the north bedroom and a

"crawl space" that spanned the two upstairs bedrooms.[5]  Police also seized a handgun located

between the driver's seat and center console of a Ford Taurus parked in front of the house on N.

71st Street.  KCKPD officers had watched Mr. Howard and Mr. Anderson get out of that car

shortly before they executed the search warrant on the house.

## II.    Legal Standard

The Fourth Amendment forbids unreasonable searches and seizures.  *Bailey v. United

States*, 568 U.S. 186, 192 (2013).  Searches "'conducted outside the judicial process, without

prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—

subject only to a few specifically established and well-delineated exceptions.'"  *Arizona v. Gant*,

556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  If a

defendant challenges a search or seizure's reasonableness, the government bears the burden to

prove, by the preponderance of evidence, the reasonableness of the challenged search or seizure.

*See United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263

F.3d 1155, 1160 (10th Cir. 2001).  If the court determines a search or seizure violated the

Constitution and the law enforcement activity was not objectively reasonable, the court, with few

exceptions, must suppress the fruits and instrumentalities of the challenged search or seizure.

*United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

---

[5]     Officers found one handgun in David Howard's safe, which he'd said defendant Dale Howard gave him to put in the safe.  Gov't Ex. 10 at 7.

Below, the court analyzes whether the government has met its burden on defendants' motions.  It concludes that the government shouldered its burden for the searches of the home and Mr. Howard's cell phone, but failed to sustain it on the challenged searches of the BMW and Mr. Anderson's phones.  The court explains its reasoning in the "Analysis" section that follows.

## III.  Analysis

### A.  Motion to Suppress Evidence Found During Search of the Home on N. 71st Street (Doc. 48)

Defendants argue the court should suppress evidence gathered from the search of the Howard residence on N. 71st Street because KCKPD applied for a warrant using evidence acquired during the BMW search.  Because the BMW search was impermissible, defendants contend, the evidence seized from the residence is fruit of a poisonous tree, *i.e.*, the unconstitutional search of the BMW.  The court disagrees.  Even without the evidence seized from the BMW search, the warrant to search Mr. Howard's home remains constitutionally sound.

The Supreme Court has prescribed a "totality-of-the circumstances approach" to decide whether the evidence presented in an affidavit meets the probable cause requirement for a search warrant.  *Illinois v. Gates*, 462 U.S. 213, 230–236 (1983).  Probable cause depends upon a "practical and common-sensical standard" that requires "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'"  *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Gates*, 462 U.S. at 238, 231).  Here, the legally acquired evidence collected from the trash pull and welfare check provided more than enough probable cause to support the warrant for the house.  Gov't Ex. 8 at 1–2, 3.

Even if defendants had standing to challenge the trash pull—it's not clear they do— defendants retain no reasonable expectation of privacy in trash left for collection outside the curtilage of the home.  *California v. Greenwood*, 486 U.S. 35, 37–41 (1988); *United States v.*

8

*Long*, 176 F.3d 1304, 1307–1309 (10th Cir. 1999). A police search of trash left outside the curtilage doesn't violate the Fourth Amendment's warrant requirement, and the evidence acquired from discarded trash may supply probable cause for a warrant to search the pertinent home. *Id.* Here, KCKPD included the information provided during the welfare check and evidence pulled from the trash at the Howard residence in its affidavit applying for the state court search warrant. Gov't Ex. 8 at 1–2, 3. In particular, the plastic bags containing methamphetamine residue and labeled "QP" provided probable cause for the warrant, independent of the evidence that KCKPD acquired from the BMW. *See Gates*, 462 U.S. at 230–236 (explaining the Supreme Court's "totality-of-the circumstances" requirement).

And before conducting the trash pull, KCKPD's officers had collected information provided voluntarily during a welfare check at the Howard residence. During that welfare check, Mr. Howard's father told police that his son sold methamphetamine and may have some methamphetamine stored in his room. Doc. 51 at 2. The Supreme Court has held that an officer's actions, "even without a warrant, . . . may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Jones v. United States*, 362 U.S. 257, 269 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980) (citing *Draper v. United States*, 358 U.S. 307, 313 (1959)). Here, the trash bags containing methamphetamine residue (and marked "QP") in the house's discarded trash corroborated the statements by Mr. Howard's father.

The combined weight of the evidence officers collected from the welfare check and trash pull provided more than enough for KCKPD to establish probable cause when applying for the warrant. *See Gates*, 462 U.S. at 230–236 (prescribing a "totality-of-the-circumstances" approach

to determining probable cause).  As one would expect, including improperly acquired evidence in a warrant application doesn't nullify a warrant if the rest of the affidavit's content provides enough other information to justify probable cause.  The Supreme Court has held that evidence included in an affidavit "of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant" doesn't affect the warrant's validity. *Rugendorf v. United States*, 376 U.S. 528, 532 (1964); *see also Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) (holding that a warrant remains valid when inadmissible evidence from an affidavit "is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause").

That's the situation here.  When the court subtracts the evidence acquired improperly from the BMW—as explained in Part B, below—the affidavit supporting the search warrant for the residence provides more than enough justification for probable cause to search the residence. The court thus denies defendants' Motion to Suppress (Doc. 48) the evidence found during the search of the Howard residence.

**B.  Motion to Suppress Evidence Acquired from Search of Mr. Howard's BMW (Doc. 46)**

Mr. Howard's next motion argues that law enforcement officers lacked probable cause to search the BMW under the "automobile exception" to the Fourth Amendment's warrant requirement.  Under this exception, "officers possessing probable cause to believe a car contains contraband may search the car without first obtaining a search warrant."  *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007).  Mr. Howard argues that the only evidence providing probable cause to search the car is that he "was running with a bag toward police and then continued onward[,]" and such evidence doesn't provide sufficient probable cause.  Doc. 46 at 3.

While the court rejects Mr. Howard's characterization of the evidence pertinent to the automobile exception—there's more than his argument admits—in the end this disagreement doesn't matter.[6]  It doesn't matter because the government never invokes the automobile exception to justify the warrantless search.  Instead the government invokes the inventory search exception.  *See* Doc. 67 (Government's Response to Defendant Howard's Motion to Suppress Search of Vehicle and All Evidence Derived [Therefrom]); *see also* Doc. 51 at 5–7 (defending the search of the BMW as a valid inventory search).  The court thus confines its analysis to this lone exception.[7]

Instead, the government claims that KCKPD conducted an inventory search of the car—another exception to the Fourth Amendment's warrant requirement.  This exception permits police officers to search a vehicle "impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents."  *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976).  A proper inventory search may not function merely as a pretext "for a general rummaging [in a vehicle] in order to discover incriminating evidence."  *Florida v. Wells*,

---

[6]      KCKPD had amassed the following evidence before officers searched the black BMW: defendant Howard's father had reported that his son was selling methamphetamine and had installed security cameras around the family's house (where defendant lived); a video showed defendant driving the same black BMW a day before officers located it in the alley; when defendant saw a police officer approach him and the BMW, he reached into the car, grabbed a bag from inside it, and ran from the officers; and the woman standing next to the defendant before he ran away possessed a loaded gun, scales, and a bag with marijuana residue inside her purse.

[7]      The court so confines its analysis because that is what the law requires.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) ("[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.' . . . '[T]he burden is on those seeking the exception to show the need for it.'" (first quoting *Katz v. United States*, 389 U.S. 347, 357 (1967); then quoting *United States v. Jeffers*, 342 U.S. 48, 51 (1951))).  *See also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("Courts are essentially passive instruments of government.  They do not, or should not, sally forth each day looking for wrongs to right.  They wait for cases to come to them and when cases arise, courts normally decide only questions presented by the parties.") (quotation cleaned up).

495 U.S. 1, 4 (1990).  Instead, to comport with the Fourth Amendment, police must follow a standardized inventory procedure.  *Id.*  Here, the government argues that KCKPD had two valid reasons to conduct an inventory search.

*First*, the government contends that a municipal ordinance provided a valid reason to tow the BMW and conduct a related inventory search because the car displayed stolen license plates. Doc. 51 at 6.  *Second*, the government argues, Mr. Howard had abandoned the BMW, allowing KCKPD to tow it and conduct an inventory search because it was "a traffic hazard and a risk for theft [or] vandalism."  *Id.*  The court doesn't reach the abandonment argument because a municipal ordinance plainly establishes that stolen license plates provided a valid reason to tow and conduct an attendant inventory search of the car's contents.

UG Ordinance 35-196(c)[8] provides:  "Any police officer may remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when: . . . (4) The motor vehicle displays license plates reported stolen."  Also, UG Ordinance 35-1 defines the word "highway" as "the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel[,]" and it includes any "street, avenue, boulevard, thoroughfare, trafficway, alley and other public ways for vehicular travel by whatever name, unless the context clearly indicates otherwise."  Mr. Howard argues that the alley where officers found the BMW doesn't meet this definition because it was situated on "a dirt road with no traffic markings."  Doc. 70 at 2. Although the court doesn't find Mr. Howard's argument persuasive, the court need not resolve this issue.  That's because the government hasn't discharged its burden to prove that the

---

[8]     The "UG" reference in the pertinent ordinance refers to the Unified Government of Wyandotte County and Kansas City, Kansas.  This governmental entity encompasses almost all the territory in Wyandotte County, Kansas, along the state's northeastern border with Missouri.  This Unified Government entity employed the KCKPD police officers involved in this case.

inventory search was "carried out in accordance with *standard procedures* in the local police department[.]" *Opperman*, 428 U.S. at 375.

The burden rests with the government to prove the reasonableness of a challenged search or seizure. *Matlock*, 415 U.S. at 177. This is so because, when the "facts with regard to an issue lie peculiarly in the knowledge of a party, that party is best situated to bear the burden of proof." *Smith v. United States*, 568 U.S. 106, 112 (2013) (citation and internal quotation marks omitted). As a corollary, the burden also rests with the government to prove that police officers conducting an inventory search conformed to a standard procedure. *United States v. Hope*, 102 F.3d 114, 117 (5th Cir. 1996) (reversing ruling on inventory search where no evidence showed "that standard inventory procedures were in place and were, in fact, followed" and explaining it's "beyond serious debate that the prosecution bears the burden of establishing that any evidence submitted, which resulted from an inventory search, was the result of a search conducted in accordance with known, established police procedures"); *see also United States v. Valdez*, No. 2:08-CR-846, 2010 WL 3815583, at *3 (D. Utah Sept. 27, 2010) (quoting *Hope*). Here, the government simply failed to meet that burden.

At the suppression hearing, the government introduced the KCKPD Towing Procedures. Gov't Ex. 3. Within those procedures, KCKPD outlines its policy for "Inventory of Impounded Vehicles." *Id.* at 4. But the government provided no testimony or other evidence showing KCKPD's officers and detectives followed that procedure in their search of the BMW.

Independent of the inventory search exception, courts also have admitted evidence seized from a vehicle where officers have searched a car as part of law enforcement's "community caretaking functions[.]"[9] *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). This principle rests

---

[9]     Our Circuit has distinguished between an inventory search requiring adherence to a standard procedure and a search conducted under the community caretaking standard. *United States v. Kendall*, 14

on the "concern for the safety of the general public who might be endangered if an intruder" removed weapons or other dangerous items from an unsupervised vehicle. *Id.* at 447. Yet again, however, the government adduced no evidence that KCKPD officers invoked the community caretaking standard when they searched the BMW. In its Response to Mr. Howard's Motion to Suppress the car search, the government said simply: "Officers may take reasonable steps to protect the public by removing firearms and searching for additional firearms from unattended vehicles under their control in areas accessible to the public." Doc. 51 at 6. But nothing else in the government's Response or its evidence supports the notion that the officers searched the BMW as part of their community caretaking duties. Instead, the government merely asserts that the BMW was "a traffic hazard and a risk for theft [or] vandalism." *Id.* Without more, the government's barren assertion about community caretaking doesn't establish that officers intended to "protect 'the public from vandals who might find a firearm . . . or . . . contraband drugs' in an impounded vehicle." *United States v. Kendall*, 14 F.4th 1116, 1125 (10th Cir. 2021) (quoting *Opperman*, 428 U.S. at 376 n.10).

In sum, the BMW's stolen Missouri license plate furnished KCKPD's officers with legal authority to tow it under UG Ordinance 35-196(c)(4). That ordinance also provided police with authority to conduct an inventory search. *Opperman*, 428 U.S. at 373. But such a search passes constitutional muster only when it follows a standardized inventory procedure, *Wells*, 495 U.S. at 4, and the government must shoulder the burden to prove officers followed such a standardized procedure, *Hope*, 102 F.3d at 117. Here, the government didn't discharge this burden. The court thus grants Mr. Howard's Motion to Suppress (Doc. 46) the evidence secured from inside the BMW.

---

F.4th 1116, 1124–25 (10th Cir. 2021) (citing *United States v. Lugo*, 978 F.2d 631, 635–36 (10th Cir. 1992)).

**C.  Motion to Suppress Evidence Found During Search of Mr. Howard's Cell Phone (Doc. 47)**

Mr. Howard next argues that the court should suppress evidence gathered from his cell phone found near the BMW.  *See generally* Doc. 47 (Motion to Suppress Search of Phone of Dale Howard and Evidence Derived Therefrom).  KCKPD Detective Blackman applied for and secured a warrant authorizing search of the contents of Mr. Howard's phone based solely on the evidence acquired during the search of the BMW.  Gov't Ex. 6 at 1–2 (Affidavit in Support of Search Warrant for Silver Android LG Cellular Phone, Dated July 14, 2021).  Mr. Howard contends the court should suppress the phone evidence because it's fruit of a poisonous tree, *i.e.*, the warrant authorizing the phone's search relied on evidence acquired by the illegal search of the BMW.  Doc. 47 at 2–3.

The fruit of the poisonous tree doctrine establishes that "evidence seized during an unlawful search could not constitute proof against the victim of the search[,]" and that such an exclusion "extends as well to the indirect as the direct products of such invasions."  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  This prohibition applies to all evidence gathered "either during or as a direct result of an unlawful invasion."  *Id.* at 485.

Mr. Howard accurately describes the information used to secure the search warrant for this phone.  The supporting affidavit relies exclusively on evidence generated by KCKPD's search of the black BMW.  *See* Gov't Ex. 6 at 1–2 (Affidavit in Support of Search Warrant for Silver Android LG Cellular Phone, Dated July 14, 2021).  And the court already has concluded that KCKPD's inventory search—on this record—doesn't justify that search.  So, the information collected from Mr. Howard's phone is a fruit derived from a poisonous tree.  But the analysis doesn't end there.

The Supreme Court has established an important exception to the exclusionary rule.  The exclusionary rule doesn't apply to a warrant-based search "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984).  This good faith exception applies unless:  (1) the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth[;]" (2) the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) the warrant was based on an affidavit that so lacked "indicia of probable cause as to render official belief in its existence entirely unreasonable[;]" or (4) the warrant was facially deficient to the point that "executing officers cannot reasonably presume it to be valid." *Id.* at 923 (quotations cleaned up).  Trying to nullify the good faith exception, Mr. Howard argues that *Leon*'s first, third, and fourth exceptions apply to KCKPD's search of his phone.  Doc. 47 at 4.  They don't.

*Leon*'s first exception applies when the judge issuing the warrant was misled by information in the supporting affidavit that the affiant "knew was false"—or would have known as much but "for his reckless disregard of the truth[.]"  *Leon*, 468 U.S. at 923.  But Mr. Howard never identifies any falsehood in the pertinent affidavit.  So, this exception doesn't apply.

*Leon*'s third exception applies when the supporting affidavit so lacked an "indicia of probable cause" that it "render[s] official belief in its existence entirely unreasonable[.]"  *Id.* Nothing suggests that Detective Blackman's affidavit fits this exception.  The closest Mr. Howard can come to meeting this standard is his showing that the affidavit relied on evidence that the court now has suppressed, *i.e.*, evidence acquired from the warrantless search of the BMW.  But that doesn't negate good faith.  A reasonable officer could have believed that KCKPD had acquired probable cause without the car's contents.  As the court already has

explained, a reasonable officer could have believed that the government, if challenged, would invoke the automobile exception to justify the officers' search of the car. A cache of properly collected evidence could support that position. *See supra* n.6 (outlining evidence properly acquired by the time KCKPD officers searched the BMW). When Detective Blackman signed the supporting affidavit, he had no reason to know that the government wouldn't invoke this exception. Nor does any evidence suggest that the detective knew KCKPD would neglect to comply with its inventory policy. In sum, the evidence doesn't establish the officers lacked any "indicia of probable cause[.]" *Leon*, 468 U.S. at 923. *Leon*'s third exception thus doesn't apply.

Last, *Leon* provides that its good faith exception doesn't apply when the warrant was so facially deficient that "executing officers cannot reasonably presume it" a valid warrant. *Id.* Nothing here suggests a facial deficiency. As with the other exceptions invoked by Mr. Howard, this last exception doesn't nullify the good faith exception.

To the contrary, the evidence supports a finding that Detective Blackman applied for the search warrant and executed it on Mr. Howard's phone in good faith reliance on the state court's warrant. Detective Blackman's affidavit applying for the warrant recounts the facts of Officer Smith's encounter with Mr. Howard and the BMW in the same manner as the court has outlined it. *Compare* Gov't Ex. 6 at 1–2 (Affidavit in Support of Search Warrant for Silver Android LG Cellular Phone, Dated July 14, 2021) *with supra* Section I.C. ("BMW Search"). Mr. Howard dropped his phone in an alley while fleeing from Officer Smith before anyone even had interacted with him, let alone before officers began searching the BMW. *See* Gov't Ex. 5. Officer Smith found the phone on the ground, in plain view. *See id.*; *see also Harman v. Pollock*, 586 F.3d 1254, 1264 (10th Cir. 2009) (recognizing that "plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has

some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity" (quotation cleaned up)).  And Detective Blackman provided the information about the BMW search in his affidavit on the reasonable belief—errant as it turns out, but one absent any bad faith—that KCKPD officers had conducted a valid inventory search of the car.  Gov't Ex. 6 at 2.  The warrant itself displays no defects that would lead a reasonable officer to doubt its validity.  Gov't Ex. 7.[10]

In sum, the court finds no evidence that KCKPD's officers acted in bad faith.  Though the court has excluded evidence from the BMW's warrantless search, officers secured the phone independent of that search.  And though Detective Blackman relied on evidence acquired from searching the BMW in his warrant affidavit, he did so in good faith reliance on a reasoned belief the search was valid.  Thus, the court denies Mr. Howard's Motion to Suppress (Doc. 47) evidence acquired from his cell phone.

### D.   Motion to Suppress Evidence from Search of Mr. Anderson's Cell Phones (Doc. 49)

Finally, defendant Carl Anderson moves to suppress evidence acquired "as a result of the illegal seizure of his property[.]"  Doc. 49 at 1.  This motion focuses on two electronic devices—smart phones—and data acquired from them.  *Id.* at 5 ("at a minimum the specific electronic devices should be suppressed because they were improperly seized, along with the data" recovered from them).  The court grants this motion, explaining why, below.[11]

---

[10]   Despite this Order's ruling that the government didn't supply evidence that the police followed its inventory search policy, nothing suggests that police *didn't* follow the policy.  Thus, it was reasonable to infer that Detective Blackman—when he applied for the warrant to search Mr. Howard's phone—reasonably believed KCKPD's inventory search of the BMW was valid.

[11]   At times, Mr. Anderson's motion paints with a broader brush.  For example, his motion urges the court to "suppress all evidence obtained from the search of the residence."  Doc. 49 at 5.  But the court already has decided the house search was valid and Mr. Anderson presents no argument to justify the more sweeping relief his motion, at times, requests.  So, the court denies any request for broader relief.

### 1. Some Preliminary Issues

The parties devote considerable effort to preliminary questions that, in the end, don't matter to the court's analysis of this motion. For example, they disagree whether Mr. Anderson was an overnight guest in the Howard home—where officers arrested him, searched him, and seized his phones. But this threshold issue matters only if the government asserts that a warrant justified the phones' seizure. *See* Doc. 49 at 3 (noting overnight guests hold legitimate expectation of privacy in premises where staying and thus have standing to challenge searches of those premises (citing *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir. 1991))). Here, the government doesn't argue that the warrant authorized a search of Mr. Anderson, so the court need not decide whether Mr. Anderson qualified as an overnight guest in the Howard home.

Indeed, the standing issue here—to the extent there is one—is simple. Officers seized Mr. Anderson's phones from the pockets of the pants he was wearing. *See* Gov't Ex. 10 at 4–5 ("The following items were removed from Carl E. Anderson . . . 2-Black cellular telephones-Right front pocket. . . ."). The cases recognize that a person holds "a reasonable expectation of privacy in the contents of his pants pockets." *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016). Officers seized the phones from Mr. Anderson's person, so he has standing to challenge their seizure. *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009) (holding defendant must establish a subjective expectation of privacy and it's one "that society is prepared to recognize . . . as reasonable").[12]

---

[12]     Had the government relied on the warrant to justify officers' seizure of Mr. Anderson's phones, it still wouldn't implicate the overnight guest/standing question. Instead, if faced with that argument, the court would have to decide whether the search warrant authorized search of Mr. Anderson or seizure of his phones. Plainly it didn't. *See* Gov't Ex. 9 (search warrant for residence on N. 71st Street). To say it another way, the court would address the argument (had the government made it) by deciding whether the warrant identified the phones as property that officers could seize. This argument would present a scope-of-the-warrant issue, not a standing question. *See Ybarra v. Illinois*, 444 U.S. 85, 92 n.4 (1979) (invalidating search of patron in tavern where warrant merely authorized search of tavern and one

19

## 2.  Search Incident to Arrest

Aiming to justify officers' warrantless seizure of Mr. Anderson's phones, the government invokes the "search incident to arrest" exception to the warrant requirement.  *See* Doc. 53 at 6–7. This exception validates a warrantless search "as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search."  *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998).  "Whether or not the [searching] officer intended to actually arrest the defendant at the time of the search is immaterial to this two-part inquiry."  *Id.* (citing *United States v. Ricard*, 563 F.2d 45, 49 (2d Cir. 1977)).

The government's Response recognizes *Anchondo*'s test.  Doc. 53 at 6–7.  And hoping to qualify its search of Mr. Anderson's person under that case's standard, the government makes the following argument:  "Carl Anderson was a convicted felon found in possession of firearms and his arrest was supported by probable cause."  *Id.* at 7.  Its brief offered no more details for this conclusory assertion, but the government's opening statement during the suppression hearing added a modicum of factual detail.

The prosecutor explained that officers saw Mr. Anderson arriving "at the home in a vehicle where a firearm [was] in plain view."  In the context of the evidence, this assertion refers to Mr. Anderson's early morning arrival at the Howard home on July 20, 2021—the morning the officers searched the Howard home.  Mr. Anderson arrived there as a passenger in a car some 15 minutes before officers executed that warrant.  The prosecutor also argued that officers knew Mr. Anderson was a convicted felon and so, "he [was] arrested" later while officers searched the Howard home.  Thus, the government contends, officers possessed a "legitimate basis" to arrest

---

particular employee in it, and explaining "a warrant to search a place cannot normally be construed to authorize a search of each individual in that place").  Given *Ybarra* and the scope of the warrant for the house, one quickly realizes why the government doesn't make this argument.

Mr. Anderson "at the time of the search," and this arrest legitimizes seizure of Mr. Anderson's phones as a valid search incident to arrest.  Doc. 53 at 7.

One of *Anchondo*'s two requirements isn't disputed here.  No one disputes the timing requirement.  156 F.3d at 1045 (arrest follows "shortly" after search).  Instead, the action here focuses on *Anchondo*'s other requirement:  Did officers have "a legitimate basis for the arrest" before they searched Mr. Anderson and seized his phones?  The court views this question as one with two subsidiary parts.  One asks about the phrase "legitimate basis" to arrest—what does that term require?  The other inquires about the substance of the alleged crime supporting the arrest.

On the first question, *Anchondo*'s "legitimate basis" requirement means that officers must have had probable cause to arrest.  *See Anchondo*, 156 F.3d at 1045 ("First, we inquire . . . whether the agent had a legitimate basis to arrest the defendant at the time of the search.  Arrests must be based on probable cause.").  Probable cause for a warrantless arrest exists "where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested."  *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (citations, ellipses, and internal quotation marks omitted).  As the Supreme Court explained, to evaluate probable cause, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation cleaned up)  Probable cause isn't "a high bar:  It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act."  *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quotation cleaned up) (quoted in *United States v. Rimer*, ___ F. Supp. 3d ___, No. 21-10049-02-JWB, 2022 WL 3975215, at *3 (D. Kan. Sept. 1, 2022)).

*Anchondo*'s second requirement requires the court to measure the "historical facts" known to officers against the requirements of the crime sponsoring the arrest. *Wesby*, 138 S. Ct. at 586. Here, officers arrested Mr. Anderson on a felon in possession charge. So, the court must compare this crime's elements with the historical facts known to police and decide whether an objectively reasonable officer would believe that Mr. Anderson had committed that crime.

A felon in possession charge requires a disqualifying conviction. 18 U.S.C. § 922(g)(1) ("It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess . . . any firearm or ammunition[.]"). And then, a disqualified person must have possessed a firearm. *Id.* The Supreme Court has held that the word "possession" in this statute is broader than just physical possession.

> Section 922(g) [of Title 18] proscribes possession alone, but covers possession in every form. By its terms, § 922(g) does not prohibit a felon from *owning* firearms. Rather, it interferes with a single incident of ownership—one of the proverbial sticks in the bundle of property rights—by preventing the felon from knowingly *possessing* his (or another person's) guns. But that stick is a thick one, encompassing what the criminal law recognizes as "actual" and "constructive" possession alike.

*Henderson v. United States*, 575 U.S. 622, 626 (2015) (citations omitted). "Actual possession exists when a person has direct physical control over a thing. Constructive possession is established when a person, though lacking such physical custody, still has the power and intent to exercise control over the object." *Id.* (citations omitted); *see also United States v. Giannukos*, 908 F.3d 649, 654 (10th Cir. 2018) (emphasizing that "constructive possession also requires *intent* to exercise control" (quoting *United States v. Benford*, 875 F.3d 1007, 1017 (10th Cir. 2017))).

Together, these principles frame the controlling question here:  Under circumstances known by KCKPD officers when they made the arrest on July 20, 2021, would a reasonable officer believe that Mr. Anderson had committed the felon in possession offense?  *See Wesby*, 138 S. Ct. at 586; *Martin*, 613 F.3d at 1302.  The court concludes that the government's evidence cannot support a finding of probable cause.[13]  Two principal facts lead the court to this conclusion.

*First*, Detective Blackman testified that KCKPD arrested Mr. Anderson because officers "knew there was a firearm in the Taurus"—the car in which Mr. Anderson arrived at the Howard home—"when the officers first made contact at the residence[.]"  But the government's evidence showed, at most, that Mr. Anderson rode as a passenger in a car with a gun in it.  Detective Blackman conceded during cross-examination that a person in the passenger seat would have difficulty seeing the gun in the location where officers found it, *i.e.*, wedged between the driver's seat and the center console.

*Second*, the government's evidence didn't establish a reasoned, factual basis for KCKPD's officers to believe—reasonably—that Mr. Anderson even knew a gun was in the car.  The government's evidence didn't show whether the gun was already in the car when Mr. Anderson sat in its passenger seat.  Likewise, the government didn't provide evidence suggesting that Mr. Anderson ever sat in the driver's seat where one might have seen the gun.  All the

---

[13]    The government never argues that KCKPD possessed enough information about Mr. Anderson to support probable cause for drug trafficking.  But one officer made a vague reference that one might interpret to assert that officers properly could arrest Mr. Anderson on drug trafficking charges.  Specifically, Detective Blackman's testimony referenced evidence about "what was upstairs" in the Howard home—which included firearms and distribution quantities of methamphetamine.  To the extent the officer meant to reference the drugs found upstairs in Mr. Howard's bedroom and an adjacent crawl space, the officers knew even less about Mr. Anderson's connection to those drugs.  And the police witnesses agreed that the other drug evidence—the report by Mr. Howard's father about his son's drug trafficking, the drug evidence in the trash pull, and the drugs found inside the BMW—didn't implicate Mr. Anderson.

available evidence supports the inference that a person sitting in the passenger seat couldn't see the firearm where officers found it.  Given so little, it's difficult to imagine probable cause for a belief Mr. Anderson had the power and intent to exercise control over the gun inside the Taurus.  *Giannukos*, 908 F.3d at 654.

Though it's a reasonably close call, the court's conclusion comports with the two Supreme Court decisions in this area:  *United States v. Di Re*, 332 U.S. 581 (1948) and *Maryland v. Pringle*, 540 U.S. 366 (2003).  The next two subsections discuss each case separately and explain why one (*Di Re*) applies here but the other (*Pringle*) does not.

   **a.   *United States v. Di Re***

In *Di Re*, an informant told a federal investigator that he had arranged to acquire some counterfeit gasoline ration coupons.  The informant also provided a specified time and place for the transaction, so the investigator and a detective went to the location and waited.  They saw the informant sitting in the back seat of a car holding two ration coupons.  As it turned out, both were fake.  Two other men occupied the car's front seat.  The informant told the investigator that the driver had provided the counterfeit coupons to him.  Officers then took all three men into custody—including defendant Di Re, who was sitting in the car's passenger seat.  Officers frisked all three for weapons and then took them to a police station.

Once there, officers directed defendant Di Re to empty his pockets.  He did so, and the contents included two gasoline and several fuel oil ration coupons.  Di Re explained he'd found those coupons in the street.  Two hours later and after questioning, officers booked Di Re and thoroughly searched him.  This search revealed 100 gasoline ration coupons inside an envelope concealed between Di Re's shirt and underwear.  All 100 coupons were counterfeit, and

prosecutors introduced them as evidence at Di Re's trial. The jury convicted him. The Second Circuit reversed, holding admission of the counterfeit coupons seized from Di Re was error.

The Supreme Court decided whether officers' search of Di Re's person "was justified as incident to search of a vehicle reasonably believed to be carrying contraband." *Id.* at 584. Justice Jackson's analysis began with an unchallenged proposition: if officers lawfully arrested Di Re then the search of his person was permissible. *Id.* at 587. The government's "defense of the arrest relie[d] most heavily on the conspiracy ground." *Id.* at 593. Justice Jackson thus framed the issue this way: "[I]f the presence of Di Re in the car [with the contraband's seller and the purchasing informant] did not authorize an inference of participation in the . . . sale, it fails to support the inference of any felony at all." *Id.* The Court held that the facts known to the officers when they arrested Di Re could not reasonably support such an inference. It grounded this rationale on three facts.

*One*: The officers possessed "no evidence" that defendant Di Re "was in the car when [the informant] obtained ration coupons from [the driver,]" and likewise there was no evidence "that [Di Re] heard or took part in any conversation on the subject." *Id.* at 593. The Court emphasized that the government's informant "certainly knew it if any part of his transaction was in Di Re's presence[,]" *id.*, and the government didn't offer any such evidence.

*Two*: The evidence couldn't sustain an "inference of participation in" illegal conduct. *Id.* Though "forceful enough in some circumstances," the "argument that one who accompanies a criminal to a crime rendezvous cannot be assumed to be a bystander . . . [was] farfetched" in the setting of this case's exchange. *Id.* at 593 (internal quotation marks omitted). The meeting between the informant and the driver wasn't secretive and it wasn't conducted "in a suspicious hide-out but [instead] in broad daylight, in plain sight of passersby, in a public street of a large

city . . . ." *Id.* And even if defendant Di Re had witnessed the driver handing some papers to the informant, "it would not follow that he knew they were ration coupons," much less counterfeit coupons. *Id.* "Presumptions of guilt are not lightly to be indulged from mere meetings." *Id.*

*Three*: Any suspicion produced by defendant Di Re's presence in the car "seems diminished, if not destroyed" by the content of the informant's tip. *Id.* at 594. The informant identified the car's *driver* as the person who sold him the contraband. *Id.* Indeed, the informant supplied no information tending to incriminate Di Re. *Id.* "Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person." *Id.* The Supreme Court thus affirmed the Second Circuit's decision reversing Mr. Di Re's conviction.

There are important similarities between *Di Re* and the facts here. The federal officers in *Di Re* possessed "no evidence" that the defendant was in the car when the driver provided contraband (the counterfeit coupons) to the informant. *Id.* at 593. So too here. Even if one views the gun as contraband—it isn't, since its criminality arises only when certain people possess it—KCKPD's officers didn't know when the gun was placed in the car. Did the car's driver hide it between the seat before Mr. Anderson got in the car? Was the gun left there before either the driver or Mr. Anderson entered the car? No evidence answers these questions and, in this sense, the officers here, as in *Di Re*, didn't know whether Mr. Anderson even knew there was a potentially illegal object inside the car.

Also, and as in *Di Re*, the tips known to KCKPD "diminished, if not destroyed" any inference of criminal conduct by Mr. Anderson. The tip from Mr. Howard's father didn't implicate Mr. Anderson. The information collected by police when Mr. Howard ran from officers didn't implicate Mr. Anderson. And the contents of the trash pull didn't suggest

wrongdoing by Mr. Anderson.  To the contrary, all these facts implicated Mr. Howard and Mr. Howard alone.

Finally, no evidence suggests that officers had reason to suspect Mr. Anderson ever possessed the gun—either actually or constructively.  This deficiency also parallels *Di Re* where officers lacked reason—at arrest—to suspect the defendant ever possessed counterfeit coupons.

In sum, the similarities here to the facts in *Di Re* favor the same result:  officers lacked probable cause to believe that Mr. Anderson had committed the felon in possession crime for which they arrested him.  Still, the second Supreme Court case complicates things.  Decided 55 years after *Di Re*, *Maryland v. Pringle* also decided a probable cause issue based—at last in part—on common occupancy in an automobile.  Part b discusses this case.

### b.  *Maryland v. Pringle*

A Maryland police officer stopped a car for speeding at 3:16 a.m.  Three men occupied the car—the driver, a second man sitting alone in the backseat and defendant Pringle.  Mr. Pringle occupied the passenger seat, right in front of the car's glovebox.  Responding to the officer's request for his driver's license and vehicle's registration, the driver opened the glove compartment.  There, the officer saw "a large amount of rolled-up money in the glove compartment."  540 U.S. at 368.  The officer checked the vehicle and driver for violations and found none.  The officer then ordered the driver out of the car so he could issue an oral warning.

The officer then asked the driver whether the car contained any weapons or narcotics.  The driver said no, and then consented to the officer's request to search the car.  It yielded $763 in cash from the glove compartment and five plastic baggies containing cocaine.  The illegal drugs were located "behind the backseat armrest[,]" which "was in the upright position flat against the rear seat" when the officer started his search.  *Id.* at 368.  The searching officer

located the cocaine after "pull[ing] down the armrest" where he found the contraband, "which had been placed between the armrest and the back seat of the car." *Id.* The officer then asked all three occupants about ownership of the money and drugs, and "told them that if no one admitted to ownership of the drugs he was going to arrest them all." *Id.* No one claimed ownership, so the officer arrested all three occupants. *Id.* at 369–70.

After his arrest and transport to a station house, Mr. Pringle waived his *Miranda* rights and responded to questions. He conceded that the cocaine belonged to him and claimed the other two occupants didn't know about the drugs. The Maryland state trial court denied Mr. Pringle's suppression motion, which theorized that his confession was a fruit of an illegal arrest. The trial court overruled the motion, concluding that the officer had probable cause to arrest Pringle. A Maryland appeals court reversed, "holding that, absent specific facts tending to show Pringle's knowledge and dominion or control over the drugs, 'the mere finding of cocaine in the back armrest when [defendant Pringle] was a front seat passenger in a car being driven by its owner is insufficient to establish probable cause for an arrest for possession.'" 540 U.S. at 369 (quoting *Pringle v. Maryland*, 805 A.2d 1016, 1027 (Md. Ct. App. 2002)). The Supreme Court took the case and Chief Justice Rehnquist, writing for a unanimous court, reversed.

The Court framed *Pringle*'s controlling issue this way: It was "uncontested" that the officer had "probable cause to believe a felony had been committed." *Id.* at 370. Instead, the only question was "whether the officer had probable cause to believe that Pringle committed that crime." *Id.* (footnote omitted). After reciting the standard for probable cause, the Court summarized the test this way:

> "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," and that the belief of guilt must be particularized with respect to the person to be searched or seized.

*Id.* at 371 (first quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949); then citing *Ybarra*, 444 U.S. at 91). The Court reasoned that the arresting officer had developed "'historical facts, viewed from the standpoint of an objectively reasonable police officer, amount[ing]' to probable cause." 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

The Court's supporting analysis emphasized that: (1) defendant Pringle was one of three occupants in a car at 3:16 in the morning; (2) the glove compartment "directly in front of Pringle['s]" seat in the car contained $763 in "rolled-up cash[;]" (3) five bags of cocaine in "glassine"—semi-transparent—baggies were concealed from view in the back seat "and accessible to all three men" in the car; and (4) when asked, none of the occupants offered any information about ownership of the money or narcotics. *Id.* at 372. The Court held "it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id.* The Court thus reversed the state appellate court's decision vacating defendant's conviction.

The Court also distinguished *Ybarra*—the case where officers holding a warrant to search a tavern and its proprietor invalidly searched the bar's patrons—because Mr. Pringle was "in a relatively small automobile, not a public tavern." *Id.* at 373. This distinction mattered, the Court explained, because "'a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.'" *Id.* (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999)). Of *Di Re*—the 1948 case—*Pringle* noted that no facts known to the arresting officer had singled out just one of the occupants as the guilty person. *Di Re*, the Court explained, had held that "'[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person.'" *Id.* at 374 (quoting *Di Re*,

332 U.S. at 594). But *Pringle* didn't involve such an informer, so this core principle of *Di Re* didn't require a different result.

### c.   Reconciling *Di Re* and *Pringle*[14]

The court recognizes a certain degree of tension between these two cases. But nothing suggests *Pringle* overturned *Di Re*, so the court proceeds on the premise that both holdings retain their vitality today. Given that premise—and no authority from our Circuit reconciling the two holdings—the court must decide which one controls this case's facts. And though it's a reasonably close call, the court concludes that *Di Re* furnishes the result here. Five considerations guide this conclusion.

*One*, no evidence identified any "historical facts" known to KCKPD officers to provide them a reasoned basis to believe Mr. Anderson had possessed the gun found in the Taurus. The governing law permitted officers to *suspect* him of this crime, but nothing provided the requisite probable cause. No evidence suggested that Mr. Anderson actually possessed the gun. This void left the possibility that Mr. Anderson constructively possessed the firearm. This alternative required facts reasonably supporting a belief that he "*knowingly* ha[d] the power at a given time to exercise dominion or control over" the weapon and he intended to exercise such control. *Giannukos*, 908 F.3d at 654 (emphasis added). But the government hasn't shown that KCKPD officers knew of "historical facts" suggesting Mr. Anderson knew he had power to exercise dominion or control, or the intent to do so.

---

[14]     The court finds no case where our Circuit has reconciled the probable cause conclusions in *Di Re* and *Pringle*. The closest the Circuit has come to this confluence is *United States v. Dennison*, 410 F.3d 1203 (10th Cir. 2005). But *Dennison* didn't evaluate a search made incident to arrest. Instead, it decided "whether officers had *reasonable suspicion* of [the defendant's] threat to officers to justify a protective sweep" of his truck. *Id.* at 1213. In so doing, the Circuit characterized *Pringle*'s holding as one "allow[ing] officers under certain circumstance to find probable cause of a joint illegal enterprise absent particularized suspicion." *Id.* at 1211. Given the material differences between *Dennison* and the current case, the court doesn't view *Dennison* to dictate the result here.

*Two*, the court's application of *Di Re*'s holding to this case's facts tracks the Circuit's application of jointly occupied space in the residential setting. Specifically, our Circuit has explained it this way: "'in joint occupancy cases, sufficient evidence that the defendant knew of and had access to firearms may not be sufficient to also show he intended to exercise dominion and control of them.'" *Id.* (quoting *Benford*, 875 F.3d at 1020). This explanation is particularly apt where, as here, nothing known to the officers suggested Mr. Anderson ever knew about the firearm.

*Three*, the facts known to officers about Mr. Anderson didn't suggest he had participated in a crime. This stands in marked contrast to *Pringle*. There, the defendant was seated immediately in front of a glovebox containing $763 in rolled up bills. This cache of cash—one Mr. Pringle easily could access and control—was near illegal drugs bagged for sale. This proximity provided the Maryland officers with a basis to infer Mr. Pringle's joint participation in a crime. KCKPD possessed no such facts about Mr. Anderson when they arrested him.

*Four*, *Di Re* warned against an inference of joint participation in crime when the tip information known to officers excluded the defendant. That was the situation in *Di Re*, where the informant advised of a forthcoming crime by the car's *driver*. The same situation exists here. KCKPD received a tip about defendant Howard's involvement with methamphetamine. But this tip never referenced Mr. Anderson. KCKPD then acquired more inculpating evidence from an encounter in an alley with Mr. Howard. Mr. Anderson was nowhere near that alley. And the trash pull again incriminated Mr. Howard—but not Mr. Anderson. Mr. Anderson's presence in the car tracks Mr. Di Re's presence in the car shortly before his arrest, but his level of involvement at that point is even more tenuous than *Di Re*'s defendant. At least Mr. Di Re could

see the coupons that turned out to be counterfeit. KCKPD's officer knew of no facts suggesting

Mr. Anderson ever saw the gun.

*Last*, the decision here to suppress evidence derived from searching Mr. Anderson's

phone tracks this court's recent treatment of *Di Re* and *Pringle* in *United States v. Rimer*, ___ F.

Supp. 3d ___, No. 21-10049-02-JWB, 2022 WL 3975215 (D. Kan. Sept. 1, 2022). There, Judge

Broomes of our court held that officers lacked probable cause to arrest the defendant, the lone

passenger in a truck while the truck's driver accepted a box containing methamphetamine. What

Judge Broomes wrote in *Rimer* applies equally here:

> [T]he circumstances did not give officers reasonable grounds to believe, at that
> point, that Defendant was a knowing participant with [the driver] in a plan to
> possess the methamphetamine. Viewed objectively, all they knew was Defendant
> was a female passenger riding with [the driver] who sat in the Hummer while [the
> driver] retrieved the box

containing methamphetamine from a cooperator during a controlled deliver. *Id.* at *4. Judge

Broomes's words equally fit the court's conclusion about Mr. Anderson here. His presence in a

car with another person and a firearm "might have been an objectively reasonable basis for

suspecting [him]" of possessing a firearm illegally. *Id.* at *5. But suspicion falls "short of the

probable cause required to arrest [defendant] for an offense." *Id.* (citing *Wong Sun*, 371 U.S. at

479).

### d.  Conclusion

In sum, the government has failed to shoulder its burden to establish that a reasonable

person, knowing the totality of "historical facts" known to KCKPD's officers when they arrested

Mr. Anderson and seized his phones, "would believe that an offense has been committed by the

person arrested." *Martin*, 613 F.3d at 1302 (quotation cleaned up). The government thus has

failed to establish probable cause for Mr. Anderson's arrest. And without that evidence, there's

no "legitimate basis" to support the search incident to an arrest. The court thus grants Mr.

Anderson's Motion to Suppress Seizure of Evidence (Doc. 49) seized from the phones on his person on July 20, 2021.

## IV.  Conclusion

For reasons explained above, the court denies the joint Motion to Suppress the search of the house on N. 71st Street (Doc. 48) and Mr. Howard's Motion to Suppress the search of his cell phone (Doc. 47).  But the court grants Mr. Howard's Motion to Suppress the BMW search (Doc. 46) and Mr. Anderson's Motion to Suppress the search of his cell phones (Doc. 49).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' joint Motion to Suppress Search and All Evidence from the search of the house on N. 71st Street, Kansas City, Kansas (Doc. 48) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Dale Howard's Motion to Suppress Search of Phone of Dale Howard and Evidence Derived Therefrom (Doc. 47) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Dale Howard's Motion to Suppress Search of Vehicle and All Evidence Derived Therefrom (Doc. 46) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Carl Anderson's Motion to Suppress Seizure of Evidence (Doc. 49) is granted.

**IT IS SO ORDERED.**

**Dated this 6th day of February, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**